Tymothy E. Moyer
55 H St Nw
APT 1126-D
Washington, DC 20001
302-757-1641
moyerty@gmail.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

TYMOTHY E. MOYER,

           Plaintiff,

vs.

UNIVERSITY OF DELAWARE;

DAWN FLOYD, individually;

CLAUDIA B. DEBONTE, individually;

KATHLEEN JENNINGS, individually;

ANGEL RIVERA, individually,

           Defendants

Case No.: **26 - 436**

**COMPLAINT**
**JURY TRIAL DEMANDED**

## I. INTRODUCTION

1. This is a civil rights conspiracy action under 42 U.S.C. § 1985(3). On February 3, 2024, Michael Uzu, a Ph.D. student at the University of Delaware, attacked Plaintiff Tymothy E. Moyer in Plaintiff's home in Wilmington, Delaware, inflicting a permanent traumatic brain injury. Uzu was arrested, indicted by a grand jury, and arraigned on felony and misdemeanor charges. The University of Delaware conducted its own investigation under its Title IX policy, held a formal hearing, and found Uzu responsible for domestic violence.

COMPLAINTJURY TRIAL DEMANDED - 1

The University's hearing officer explicitly rejected Uzu's self-defense claims as "inconsistent and unreliable" and found that Uzu's account contained "multiple irreconcilable inconsistencies" and "material omissions."

2. Defendant DeBonte made false post-prosecution statements regarding the evidentiary basis for the dismissal in or around August through September 2025. Despite the University's formal finding of responsibility, Defendants engaged in a coordinated conspiracy to deny Plaintiff the equal protection of the laws on account of his race. Defendant DeBonte, a Delaware Deputy Attorney General, made a false statement to a state legislator asserting that 'the evidence did not support filing charges,' a self-fulfilling assertion premised on evidence that the institutions responsible for collecting it failed to collect. DeBonte made this statement to the public official long after the criminal prosecution had concluded by nolle prosequi on September 11, 2024.

3. Defendant Rivera, a state-employed Victims' Advocate assigned to support Plaintiff during the criminal justice process, affirmatively concealed the coordination between the University and the Department of Justice. Rivera assured Plaintiff in written communications that the two institutions would not be communicating regarding his case. Certified government records obtained through the Freedom of Information Act subsequently showed that statement to be false: University officials had arranged a meeting on April 17, 2024, at which Department of Justice contact information was transmitted. Subsequent records confirmed that inter-agency communication occurred. The concealment of inter-agency coordination from the victim is itself probative of improper purpose: a state representative does not lie about institutional communication unless the coordination serves a purpose the state seeks to hide.

COMPLAINTJURY TRIAL DEMANDED - 2

4. Defendant Floyd, the University's Title IX Coordinator, imposed a deferred suspension in January 2025 as the sole sanction for domestic violence causing permanent brain injury, while the University had deployed maximum institutional resources for an anonymous assault report involving an unknown perpetrator just months earlier.

5. Defendant Jennings, as Attorney General, received formal notice through the Office of Disciplinary Counsel that her subordinate DeBonte had made a false statement to a state legislator. Jennings took no corrective action. The disciplinary complaints were docketed on December 30, 2025, (DeBonte) and (Jennings), alleging violations of Rule 8.4(c) and Rule 5.1 of the Delaware Lawyers' Rules of Professional Conduct. The Office of Disciplinary Counsel closed both matters without substantive resolution, and Jennings took no action to correct DeBonte's false statement or to resolve the documented inter-agency evidentiary contradiction.

6. Plaintiff is a lifelong Delaware citizen, a Black gay man, and a graduate student at Georgetown University. Over twenty-four months, Plaintiff sought accountability through fourteen documented requests across ten institutional mechanisms. Every mechanism either declined, deflected, or failed. This complaint preserves Plaintiff's right to seek redress in federal court for the conspiracy that produced those failures.

COMPLAINTJURY TRIAL DEMANDED - 3

## II. PARTIES

7. Plaintiff Tymothy E. Moyer ("Plaintiff") is a citizen of the State of Delaware, domiciled in Hockessin, Delaware, and currently residing in Washington, D.C., while completing a Master's degree at Georgetown University. Plaintiff is a Black, gay male. Plaintiff sustained a permanent traumatic brain injury as a result of the assault described herein.

8. Defendant University of Delaware ("UD" or "the University") is a public university chartered under the laws of the State of Delaware, receiving federal financial assistance, and located in Newark, Delaware. UD employed Defendant Floyd and exercised jurisdiction over the Title IX proceedings at issue in this action.

9. Defendant Dawn Floyd ("Floyd") is the Title IX Coordinator at UD. Floyd is sued in her individual capacity for administrative actions taken under color of state law, including the coordination with the Delaware Department of Justice, the imposition of a disproportionate sanction after a formal finding of domestic violence, and the hostile characterization of Plaintiff's procedural actions during the Title IX process.

10. Defendant Claudia DeBonte ("DeBonte") is a Deputy Attorney General in the Delaware Department of Justice who was assigned to prosecute the criminal charges against Uzu. DeBonte is sued in her individual capacity for post-prosecution administrative conduct, specifically: making a false statement to a state legislator regarding the evidentiary basis for the dismissal after the prosecution had concluded, and participating in the obstruction of Plaintiff's Freedom of Information Act requests. This complaint does not challenge DeBonte's charging decision.

COMPLAINTJURY TRIAL DEMANDED - 4

11. Defendant Kathleen Jennings ("Jennings") is the Attorney General of the State of Delaware. Jennings is sued in her individual capacity for: (a) failure to take corrective action after receiving formal notice through the Office of Disciplinary Counsel that DeBonte had made a false post-prosecution statement to a state legislator, docketed December 30, 2025; and (b) administrative obstruction of Plaintiff's Freedom of Information Act requests through her office.

12. Defendant Angel Rivera ("Rivera") is a Victims' Advocate employed by the Delaware Department of Justice who was assigned to support Plaintiff as the victim in the criminal prosecution of Uzu. Rivera is sued in his individual capacity for affirmatively providing false assurances to Plaintiff, through written communications, that the University and the Department of Justice would not be communicating regarding Plaintiff's case, thereby concealing the inter-agency coordination that forms the basis of the conspiracy alleged herein.

### III. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(1) (civil rights conspiracy to deprive any person of rights, privileges, or immunities secured by the Constitution).

14. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in the District of Delaware, including the assault, the University's Title IX proceedings, the Department of Justice's prosecution and dismissal of criminal charges, and the inter-agency coordination described herein.

COMPLAINTJURY TRIAL DEMANDED - 5

15. This action is timely. Claims under 42 U.S.C. § 1985(3) borrow the forum state's statute of limitations for personal injury actions. *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 80 (3d Cir. 1989) (holding that § 1985(3) claims are "subject to the same limitations period" as § 1983 claims). A § 1985 claim accrues when the plaintiff knew or should have known of the alleged conspiracy, and the limitations period runs from each overt act causing damage. *Dique v. N.J. State Police*, 603 F.3d 181, 189 (3d Cir. 2010); see also *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (a federal cause of action accrues "when the plaintiff knew or should have known of the injury upon which its action is based"). Delaware's limitations period for personal injury actions is two years. 10 Del. C. § 8119. The conspiracy alleged herein accrued no earlier than April 17, 2024, the date on which University officials arranged the meeting at which Department of Justice contact information was transmitted in connection with Plaintiff's case. Plaintiff could not reasonably have known of the alleged conspiracy before April 17, 2024 because Defendant Rivera's contemporaneous written assurances concealed the inter-agency coordination from Plaintiff.

COMPLAINTJURY TRIAL DEMANDED - 6

## IV. FACTUAL ALLEGATIONS

### A. The Assault and Criminal Charges

16. On the late evening of February 2, 2024, into the early morning of February 3, 2024, Michael Uzu attacked Plaintiff in Plaintiff's apartment in Wilmington, Delaware. Uzu struck Plaintiff multiple times with a titanium lacrosse stick, Uzu's fists, and Plaintiff's cell phone.

Uzu struck Plaintiff in the head with the lacrosse stick, causing severe facial trauma and a laceration on the top of his head that required surgical staples to close. Outside the apartment building, Uzu picked up a large rock and positioned himself to strike Plaintiff with it before a bystander intervened.

17. Plaintiff was transported to the emergency room at Christiana Care, where he was treated for head trauma, a concussion, and a laceration requiring staples. Subsequent medical evaluation by the Mid-Atlantic Concussion Alliance on April 17, 2024, documented multiple deficits caused by a traumatic brain injury. A BrainScope EEG test dated July 1, 2024, returned a positive result indicating "permanent structural injury significant enough to leave long term electrical pattern disruption." Plaintiff's traumatic brain injury is permanent.

18. Uzu was arrested on February 3, 2024. A grand jury subsequently indicted Uzu. Uzu was arraigned on felony assault in the second degree and misdemeanor assault charges. The charges remained pending through arraignment and an open plea period that extended for months.

COMPLAINTJURY TRIAL DEMANDED - 7

**B. The University's Finding of Responsibility**

19. On April 26, 2024, Plaintiff filed a formal complaint with the University's Office of Equity and Inclusion alleging that Uzu engaged in domestic violence in violation of the University's Non-Discrimination, Sexual Misconduct and Title IX Policy.

20. Uzu filed a cross-complaint against Plaintiff on May 10, 2024, alleging that Plaintiff had engaged in domestic violence and stalking. Plaintiff is not and has never been a student at the University of Delaware. Plaintiff requested dismissal of the cross-complaint on June 26, 2024, September 10, 2024, and November 21, 2024. Defendant Floyd denied each request.

21. Following an investigation and a hearing conducted on November 22, 2024, the University's hearing officer issued a written determination on January 8, 2025. The hearing officer found, by a preponderance of the evidence, that Uzu engaged in domestic violence against Plaintiff in violation of the University's policy. The hearing officer further found that the evidence was insufficient to support any of Uzu's allegations against Plaintiff.

22. Specifically, the hearing officer found that Uzu's self-defense claims were not supported by the evidence. The hearing officer determined that Uzu's account of the February 2-3, 2024 altercation contained "multiple irreconcilable inconsistencies." The hearing officer found that Uzu had omitted material facts regarding the lacrosse stick and a rock, both of which "could arguably portray him as the aggressor". The hearing officer concluded that Plaintiff's account of the incident was "more reliable based on internal consistency, inherent plausibility, and lack of material omissions."

COMPLAINTJURY TRIAL DEMANDED - 8

23. The hearing officer further found that the level of injury sustained by Plaintiff, supported by voluminous medical documentation, "is unlikely to have occurred through purely defensive actions on Uzu's part."

### C. The Inter-Agency Coordination and Its Concealment

24. On April 17, 2024, University official Holli Harvey-Dudlek contacted Plaintiff regarding Plaintiff's case, scheduled a same-day Zoom meeting, and included Defendant Floyd in that meeting. Following that meeting, Plaintiff sent Defendant Rivera's Department of Justice contact information to Harvey-Dudlek and Floyd. Harvey-Dudlek acknowledged receipt. The following sequence, documented in the administrative record obtained through the Freedom of Information Act, supports the inference that the University was preparing for or engaging in inter-agency coordination with the Delaware Department of Justice regarding Plaintiff's case.

25. In or around April 2024, Defendant Rivera, the state-employed Victims' Advocate assigned to support Plaintiff in the criminal prosecution, assured Plaintiff through written communications that the University and the Department of Justice would not be communicating regarding Plaintiff's case. This assurance was false. The administrative record confirms that the University had already arranged the April 17, 2024 meeting described in the preceding paragraph, during which Defendant Floyd received Rivera's Department of Justice contact information.

COMPLAINTJURY TRIAL DEMANDED - 9

26. Rivera's assurances were false. The administrative record confirms that the University had already arranged the April 17, 2024 meeting at which Department of Justice contact information was transmitted, before Rivera represented to Plaintiff that the University and the Department of Justice would not be communicating regarding his case. Rivera's false assurance is not merely evidence of poor communication. The false assurance is affirmative evidence that the inter-agency coordination was something the state sought to conceal from the victim. A state representative does not provide false written and verbal assurances about whether two institutions are communicating unless the coordination serves a purpose the state does not want the affected party to know about. The concealment transforms what might otherwise appear to be routine inter-agency contact into evidence of coordinated action directed at a specific outcome. The outcome being the suppression of accountability for Uzu at the expense of Plaintiff's rights.

27. Between March and July 2024, Defendant Rivera received from Plaintiff medical records documenting traumatic brain injury, concussion, loss of consciousness, convergence insufficiency, and saccadic dysfunction. On July 14, 2024, Rivera informed Plaintiff in writing that he had forwarded those medical records to the prosecutor assigned to Uzu's case for review. By the date of the September 11, 2024 dismissal, the Department of Justice had received, through its own designated representative, detailed documentation of the severity and permanence of Plaintiff's injuries.

COMPLAINTJURY TRIAL DEMANDED - 10

## D. The Dismissal of Criminal Charges

28. On September 11, 2024, the criminal charges against Uzu were dismissed by nolle prosequi. The stated basis for the dismissal was "self-defense."

29. DeBonte's stated rationale for the dismissal, self-defense, is the same theory that the University's hearing officer subsequently rejected as inconsistent and unreliable after examining substantially the same factual record. The University's hearing officer found that Uzu's self-defense claims were not credible, that his account contained material omissions regarding the weapons he used, and that the severity of Plaintiff's documented injuries was inconsistent with purely defensive conduct. DeBonte reached the opposite conclusion on substantially overlapping evidence.

## E. Post-Prosecution Concealment and Obstruction

30. After the criminal prosecution concluded, Defendant DeBonte made false post-prosecution statements regarding the evidentiary basis for the dismissal and participated in administrative obstruction of Plaintiff's efforts to obtain records. Defendant DeBonte made a false statement to a state legislator, Representative Smith, asserting that "the evidence did not support charges" against Uzu. The evidence DeBonte referenced did not exist in substantial part because law enforcement never collected it. The Wilmington Police Department collected zero physical evidence at the felony assault scene: no photographs, no forensic analysis, no crime scene documentation despite large visible blood smears, and an arrest. The weapon visible in Plaintiff's video evidence, a titanium lacrosse stick, remained uncollected for the entirety of the case.

COMPLAINTJURY TRIAL DEMANDED - 11

DeBonte's statement that the evidence did not support charges was a self-fulfilling assertion: the evidence did not exist because the institutions responsible for collecting it failed to do so.

31. Over a period of twelve months, Plaintiff submitted multiple Freedom of Information Act requests seeking records of the inter-agency coordination between the University and the Department of Justice. Five formal government responses were issued. The responses contained irreconcilable positions. A Deputy Attorney General reviewing one of those responses found that the University's sworn submission failed to meet the evidentiary standard required under governing FOIA precedent. Despite this finding, no records were produced, and the evidentiary contradiction between the University's domestic violence finding and the Department of Justice's dismissal citing self-defense was never resolved through the administrative process.

32. Defendant Jennings, as Attorney General, received formal notice of DeBonte's false post-prosecution statement through the Office of Disciplinary Counsel. Disciplinary complaints were docketed on December 30, 2025: (DeBonte, Rule 8.4(c)) and (Jennings, Rule 5.1 supervisory responsibility). Despite this formal notice that her subordinate had made a false statement to a state legislator about the evidentiary basis for a discontinued prosecution, Jennings took no corrective action. The ODC closed both matters without substantive resolution. Jennings neither corrected DeBonte's false statement nor intervened to resolve the documented inter-agency evidentiary contradiction.

COMPLAINTJURY TRIAL DEMANDED - 12

33. The pattern of administrative obstruction extended beyond any single FOIA response. Over a period of approximately twelve months, the University and the Delaware Department of Justice issued written responses and sworn submissions taking materially inconsistent positions regarding the existence, character, and searchability of inter-agency records. On July 30, 2025, the Department of Justice issued a determination finding that the University had failed to meet its burden of proof under the standard set forth in Judicial Watch, Inc. v. University of Delaware, 267 A.3d 996 (Del. 2021). When the University attempted to justify prior denials through sworn submissions, the described search methodology focused on financial ledgers and budget databases rather than the communication systems where inter-agency correspondence would ordinarily reside. These inconsistent positions, combined with the methodological limits of the University's described search efforts, support the inference that the administrative process was not structured to locate the category of records Plaintiff sought.

### F. Differential Institutional Response

34. Plaintiff is African American. The institutional response to Plaintiff's case stands in stark contrast to the response afforded to other incidents of violence involving different demographic configurations, across both the University and the Department of Justice.

COMPLAINTJURY TRIAL DEMANDED - 13

35. In September 2024, the same month the criminal charges against Uzu were dismissed, Defendant Floyd had left Plaintiff's procedural motion unanswered for over seventy days, the University issued a campus-wide "Ghost Alert" in response to an anonymous report of an off-campus assault involving an unknown perpetrator. The University deployed maximum institutional resources for that report, including a campus-wide notification system. Plaintiff, a documented domestic violence victim with a formal finding of responsibility against a known, identified perpetrator, received a deferred suspension, imposed in January 2025, as the sole institutional response.

36. In a separate matter, the University swiftly suspended a white male student and initiated conduct proceedings after that student was alleged to have engaged in misconduct against female students in an out-of-state incident. The University acted on the basis of an arrest alone, without a formal finding of responsibility.

37. In the matter involving Brandon Freyre, a white male student, the University took swift consequential action after the incident received public attention. Freyre's conduct and Uzu's conduct are comparably severe: both involve student-perpetrated domestic violence resulting in physical injury. Uzu's conduct arguably exceeds Freyre's in severity, as it caused permanent traumatic brain injury requiring surgical staples and producing documented long-term neurological deficits.

COMPLAINTJURY TRIAL DEMANDED - 14

38. The differential treatment extended beyond the University to the criminal justice system. When comparable or lesser acts of domestic violence involved white perpetrators and female victims, the State of Delaware pursued prosecution with urgency. Plaintiff's case, involving a Black gay male victim, was marked by delay: months of inaction on an open plea, followed by dismissal on a theory the University's own adjudicator rejected. The pattern of differential treatment at both the institutional and prosecutorial levels, consistently disfavoring the same complainant, reinforces the inference that the common variable is not institutional capacity or evidentiary ambiguity, but the identity of the victim.

39. These comparators establish that the University possesses and deploys significant institutional capacity to respond to violence when it chooses to do so, and that the State possesses and exercises prosecutorial will when it chooses to do so. The variable that distinguishes Plaintiff's case from these comparators, after eliminating severity, timing, institutional capacity, and prosecutorial discretion as alternative explanations, is the racial identity of the complainant.

40. The University's awareness of its exposure to federal civil rights liability during the relevant period is independently documented. In Sanogo v. University of Delaware, C.A. No. 1:24-cv-00750-RGA (D. Del.), filed June 25, 2024, a Black male plaintiff brought Section 1983 claims against the University arising from the conduct of University employees. The University, represented by Saul Ewing LLP, litigated that action through a motion to dismiss ruling on May 16, 2025, in which the court permitted the excessive force and battery claims to proceed. The action was resolved by stipulated dismissal approximately five months later.

COMPLAINTJURY TRIAL DEMANDED - 15

The University's General Counsel and outside litigation counsel were managing Sanogo contemporaneously with the Title IX proceedings and FOIA responses in Plaintiff's case. The University cannot claim ignorance of the federal civil rights framework it was actively litigating during the same period it was denying Plaintiff meaningful institutional accountability.

### G. Exhaustion of Institutional Remedies

41. Between February 2024 and March 2026, Plaintiff sought accountability through fourteen documented instances across ten distinct institutional mechanisms, including the Title IX process, the criminal prosecution, the Delaware Freedom of Information Act, the Delaware Office of Disciplinary Counsel, the Middle States Commission on Higher Education, the Office of the Governor, the Delaware Department of Justice Civil Rights and Public Trust Division, the Judicial Council, the Family Court, and the Wilmington Police Department FOIA process. Plaintiff also notified federal authorities, including the U.S. Immigration and Customs Enforcement Student and Exchange Visitor Program and the Department of Homeland Security Office for Civil Rights. Plaintiff submitted a formal letter to the University of Delaware Board of Trustees on April 1, 2025, enclosing the police report and injury photographs documenting the assault. The DOJ Civil Rights and Public Trust Division declined jurisdiction on April 7, 2025. Every mechanism either declined to act, deflected to another institution, or failed to produce a substantive response.

COMPLAINTJURY TRIAL DEMANDED - 16

## H. Injuries

42. As a direct and proximate result of the assault and the conspiracy alleged herein, Plaintiff has suffered permanent traumatic brain injury with documented cognitive, neurological, and emotional deficits; loss of employment income; medical expenses; legal fees incurred to defend against Uzu's baseless cross-complaint and counter-petition; disruption of his graduate education at Georgetown University, where he operates under heavy academic accommodations; and severe emotional and psychological harm including depression, acute anxiety, post-traumatic stress disorder, and ongoing fear for his safety.

COMPLAINTJURY TRIAL DEMANDED - 17

# V. COUNT I

## CONSPIRACY TO DEPRIVE CIVIL RIGHTS

## 42 U.S.C. § 1985(3)

### (Against All Defendants)

43. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 42 as though fully set forth herein. Plaintiff does not claim a free-standing constitutional entitlement to prosecution; he claims that Defendants exercised institutional and prosecutorial discretion in a racially discriminatory manner, thereby denying equal protection of the laws.

### Element One: Conspiracy

44. Defendants conspired with one another to deprive Plaintiff of the equal protection of the laws. The conspiracy alleged herein involves coordinated action between employees of two separate institutions, the University of Delaware and the Delaware Department of Justice, acting across institutional boundaries. The conspiracy is evidenced by three categories of proof:

COMPLAINTJURY TRIAL DEMANDED - 18

45. First, documented evidence of coordination: On April 17, 2024, University official Harvey-Dudlek arranged a meeting with Plaintiff that included Defendant Floyd, after which Plaintiff's transmission of Rivera's Department of Justice contact information to Harvey-Dudlek and Floyd was acknowledged. Inter-agency communication followed.

46. Second, direct evidence of concealment: Defendant Rivera, the state's designated representative to Plaintiff, provided false written assurances that the institutions at the center of Plaintiff's case would not be communicating. A state representative does not conceal routine inter-agency coordination from a crime victim unless the coordination serves a purpose the state does not want the victim to know about.

47. Third, coordinated outcome evidence: Following the concealed coordination, the University and the Department of Justice reached contradictory conclusions on substantially the same factual record, with the contradiction consistently disfavoring Plaintiff. The University found Uzu's self-defense claims inconsistent and unreliable. DeBonte accepted those same claims. The University found Plaintiff's account more reliable. DeBonte discarded it.

The institutions then engaged in coordinated obstruction of Plaintiff's FOIA requests seeking records of the very coordination that Rivera had denied.

48. The conspiracy is further evidenced by fourteen documented instances of institutional non-response across ten mechanisms spanning twenty-four months, in which every available avenue of accountability either declined, deflected, or failed. This pattern is not the product of

COMPLAINTJURY TRIAL DEMANDED - 19

independent institutional action attributable to coincidence. The pattern is more consistent with coordinated institutional non-action than with independent institutional failure, given the direct evidence of the coordination meeting and the direct evidence of its concealment from the victim by the state's own designated representative.

### Element Two: Class-Based Discriminatory Animus

49. The conspiracy was motivated by racial animus directed at Plaintiff as a member of a class protected by 42 U.S.C. § 1985(3). Plaintiff is African American. See Griffin v. Breckenridge, 403 U.S. 88, 102 (1971) (racial animus satisfies the class-based element); Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997) (applying Griffin in the Third Circuit).

50. The racial animus motivating the conspiracy is demonstrated by the differential institutional response to violence depending on the demographic identity of the complainant, as set forth in paragraphs 34 through 39. The University deployed significant institutional resources for anonymous reports and for incidents involving white male perpetrators and female victims, while imposing the minimum available sanction on a known perpetrator found responsible for domestic violence causing permanent brain injury to a Black gay male complainant.

51. The animus extended beyond the University to the prosecutorial function. When the State of Delaware prosecuted comparable domestic violence cases involving white perpetrators and female victims, the State acted with urgency and pursued accountability. When the State prosecuted Uzu for felony assault causing permanent brain injury to a Black gay male victim, the

COMPLAINTJURY TRIAL DEMANDED - 20

prosecution was marked by months of unexplained delay on an open plea, followed by dismissal on the same self-defense theory the University's adjudicator subsequently rejected as unreliable. The differential prosecutorial treatment parallels the differential institutional treatment, and both disfavor the same complainant, producing an inference of animus that cannot be attributed to any single institution's independent judgment.

52. After eliminating severity, timing, institutional capacity, and prosecutorial discretion as alternative explanations for this differential treatment, the remaining variable is the racial identity of the complainant.

### Element Three: Act in Furtherance of the Conspiracy

53. Defendants committed overt acts in furtherance of the conspiracy, including: (a) Rivera's false written assurances concealing the inter-agency coordination; (b) DeBonte's reliance on a self-defense rationale that the University's hearing officer subsequently found inconsistent and unreliable, followed by the false post-prosecution characterization of the evidentiary basis for the dismissal; (c) Floyd's imposition of a deferred suspension in January 2025 as the sole sanction for domestic violence causing permanent brain injury; (d) DeBonte's post-prosecution false statement to Representative Smith; (e) Jennings's failure to take corrective action after receiving formal notice of DeBonte's false statement through the ODC process; and (f) the coordinated obstruction of Plaintiff's FOIA requests.

COMPLAINTJURY TRIAL DEMANDED - 21

**Element Four: Injury**

54. As a direct and proximate result of the conspiracy, Plaintiff was injured in his person and deprived of his rights and privileges as a citizen of the United States, including the right to equal protection of the laws, the equal application of institutional and prosecutorial mechanisms that were available to and deployed for other similarly situated complainants. Plaintiff's injuries include those set forth in paragraph 42.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally, and award the following relief:

a. Compensatory damages in an amount to be determined at trial, including damages for lost wages, medical expenses, legal fees, emotional distress, and pain and suffering;

b. Punitive damages against each individual Defendant in an amount to be determined at trial;

c. A declaratory judgment that Defendants conspired to deprive Plaintiff of the equal protection of the laws in violation of 42 U.S.C. § 1985(3);

d. Costs of suit and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

e. Such other and further relief as this Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

COMPLAINTJURY TRIAL DEMANDED - 22

Respectfully submitted,

Tymothy E. Moyer

Pro Se Plaintiff

55H St NW APT 1126-D

Washington, DC 20001

Email: moyerty@gmail.com

Dated: 4/16/2026

_____
Litigator Pro Se

COMPLAINTJURY TRIAL DEMANDED - 23